No. 00-835

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 311

STATE OF MONTANA,

> Plaintiff and Respondent,

v.

KENT ALLEN TICHENOR,

> Defendant and Appellant.

APPEAL FROM:     District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

> For Appellant:

> Thomas S. Winsor, Michael Scott Winsor, Winsor Law Firm, Helena,
Montana

> For Respondent:

> Mike McGrath, Montana Attorney General, Ilka Becker, Assistant Montana
Attorney General, Helena, Montana; Leo J. Gallagher, Lewis and Clark
County Attorney, Carolyn A. Clemens, Deputy Lewis and Clark County
Attorney, Helena, Montana

Submitted on Briefs:  June 7, 2001

Decided:  December 16, 2002

Filed:

_____
Clerk

Justice James. C. Nelson delivered the Opinion of the Court.

¶1     Kent Allen Tichenor appeals his conviction in the District Court for the First Judicial District, Lewis and Clark County, of three counts of criminal trespass to property, two counts of stalking and one count of partner or family member assault. We affirm.

¶2     We address the following issues on appeal:

¶3     1. Did the District Court properly deny as premature Tichenor's pretrial motion to dismiss the burglary and stalking charges?

¶4     2. Did the District Court properly deny Tichenor's motion to dismiss the felony stalking count?

¶5     3. Did the District Court properly exercise its discretion in giving Jury Instructions 23 and 24 regarding stalking?

**Factual and Procedural Background**

¶6     Tichenor and Bobbi Jo Nall began dating in the summer or fall of 1998. In late November or early December 1998, Nall moved into a new apartment. Shortly thereafter, Tichenor moved in with her and Nall gave Tichenor his own key to the apartment. Tichenor provided some of the furniture for the apartment and, on at least one occasion, Tichenor contributed to the rent. Nall had a daughter from a previous marriage who occasionally stayed at the apartment with her mother.

¶7     Eventually, Tichenor moved into his own place, but he and Nall continued their relationship. Tichenor provided Nall with a key to his place and he kept the key to Nall's apartment. The relationship between the parties began to sour in September 1999, when they had a physical altercation, but they continued dating, continued to call each other several

2

times each day, and continued to spend the night at each other's residences. Nall testified that following the September incident, she and Tichenor returned each other's keys, but Tichenor testified that Nall was aware that he still had a key to her apartment. Also, Tichenor's roommate testified that Nall retained a key to Tichenor's apartment because she used her key to enter the apartment while Tichenor was in jail.

¶8 On November 2, 1999, during one of their daily phone conversations, Nall informed Tichenor that, rather than going out with him that evening, she had a date with one of her male co-workers. Tichenor later testified that he was surprised by this as he was not aware that his relationship with Nall was over. He went to her work place, followed her to a gas station and followed her home, all the while trying to discourage her from dating another man. At Nall's apartment, finding the safety chain on the door fastened, Tichenor climbed through a window he knew Nall left open to allow her cat to come in and out. Once inside, Tichenor confronted Nall and pushed her into her bedroom. (This entry into Nall's apartment gave rise to the first count of burglary against Tichenor.)

¶9 At the time Tichenor entered her apartment, Nall was on the phone with the male friend she planned to see that evening. When Tichenor pushed her, she called out her friend's name knowing that he was still on the phone. Tichenor grabbed the phone and hung it up. He ordered Nall into the living room and proceeded to yell at her. She twice tried to leave, but Tichenor stopped her. At one point, Tichenor threw the telephone on the floor and crushed it with his foot. Nall later testified that Tichenor threatened to kill her. (These facts gave rise to the charge of partner or family member assault against Tichenor.)

3

¶10    After a heated discussion regarding their relationship, Tichenor left Nall's apartment and returned to his home.  Meanwhile, Nall's friend, hearing Nall call out his name when Tichenor confronted her, called the police.  Nall eventually spoke with the police, but she initially declined to press charges against Tichenor.

¶11    The following day, Tichenor returned to Nall's apartment when she was not at home, let himself in with his key, and left a new telephone to replace the one he had broken and a card of apology for Nall.  (This entry into Nall's apartment gave rise to the second count of burglary against Tichenor.)  The day after that, Tichenor returned to the apartment, installed the telephone, left another note for Nall and fed Nall's cat.  (This entry into Nall's apartment gave rise to the third count of burglary against Tichenor.)

¶12    Tichenor was arrested on November 4, 1999, on the charges of burglary and partner or family member assault.  At Tichenor's arraignment, Justice of the Peace Wallace Jewell instructed Tichenor that as a condition of his bond, he was not to have any contact with Nall.  However, Nall subsequently complained to the county attorney's office that she had been receiving numerous hang-up calls.  The county attorney's office subpoenaed Tichenor's cell phone records and discovered that he had called Nall's apartment 46 times and her place of employment 23 times between November 11 and November 16, 1999.  (These phone calls gave rise to one of the stalking counts against Tichenor.)

¶13    On November 22, 1999, both Tichenor and Nall were present at a party at the home of mutual friends. Tichenor and Nall ended up spending the night together.  Tichenor testified that he and Nall made plans to get together again the next night, but he was arrested and

4

incarcerated in the Lewis and Clark County Jail for violating the court's no-contact order. Following his arrest, Tichenor placed over 50 calls to Nall's apartment from the Lewis and Clark County Jail between November 24 and November 28, 1999. Nall recorded many of the calls on her answering machine and played them for a police investigator. (These phone calls gave rise to the other count of stalking against Tichenor.)

¶14 On December 17, 1999, the State charged Tichenor by Information with three counts of felony burglary in violation of § 45-6-204, MCA, one count of partner or family member assault in violation of § 45-5-206(1)(c), MCA, and two counts of stalking in violation of § 45-5-220(1)(b), MCA. Following his arraignment, Tichenor moved to dismiss the burglary and stalking charges for lack of sufficient evidence. Tichenor claimed that he lacked the necessary intent required for the stalking charges and that he had license to enter Nall's apartment so the burglary charges were unfounded. After a hearing, the District Court denied the motion.

¶15 Thereafter, the State requested leave to amend the Information to add a third count of stalking based on Tichenor's repeated attempts to contact Nall by phone and by mail while Tichenor was incarcerated in the Lewis and Clark County Jail. Rather than grant the request to add a third count of stalking, the court merged the new charges into one of the other two counts.

¶16 Trial was conducted from May 1 through May 4, 2000. The jury found Tichenor guilty of three counts of misdemeanor trespass as a lesser included offense of burglary, one count of partner or family member assault, and two counts of stalking. On June 2, 2000,

5

Tichenor moved for a new trial claiming that the State failed to produce evidence of intent; that he was improperly charged for more than one count of stalking; that the jury was given improper jury instructions; and that his communications and attempted communications with Nall were constitutionally protected. The District Court denied Tichenor's motion.

¶17 Tichenor was sentenced on July 11, 2000, to six months in the Lewis and Clark County Jail on each of the criminal trespass counts, one year each in the Lewis and Clark County Jail for the count of partner or family member assault and the first count of stalking, and five years in Montana State Prison on the second stalking count. He also received a $10,000 fine on the second stalking count and a sentence enhancement of 20 years with five years suspended for being a persistent felony offender. Tichenor appeals the District Court's judgment and sentence.

## Standard of Review

¶18 The denial of a motion to dismiss in a criminal case is a question of law and we review a district court's conclusions of law to determine whether those conclusions are correct. *State v. Hocevar*, 2000 MT 157, ¶ 115, 300 Mont. 167, ¶ 115, 7 P.3d 329, ¶ 115 (citing *State v. Weaver*, 1998 MT 167, ¶ 43, 290 Mont. 58, ¶ 43, 964 P.2d 713, ¶ 43).

## Issue 1.

¶19 *Did the District Court properly deny as premature Tichenor's pretrial motion to dismiss the burglary and stalking charges?*

¶20 Tichenor filed a pretrial motion to dismiss the burglary and stalking charges alleging that he lacked the requisite intent to be convicted of stalking and that he could not be

6

convicted of burglary because he had license to enter Nall's apartment. The District Court denied the motion noting that Tichenor was essentially asking the court to judge the evidence prior to trial. The court determined that the facts alleged in the State's Affidavit in Support of Leave to File Information, if proven, supported the charges contained in the Information and that it was up to the jury, not the court, to weigh the evidence. The District Court further noted that after the presentation of the State's case, the court could order a dismissal of one or more of the counts if warranted, but that it was premature to order a dismissal before the State had presented any evidence. Nevertheless, Tichenor did not move for a directed verdict for insufficiency of the evidence at the close of the State's case or at the close of all of the evidence, nor did the District Court dismiss any of the charges against Tichenor *sua sponte*.

¶21 Whether Tichenor had the requisite intent to be convicted of stalking was a question of fact for the jury. *See State v. DeVore*, 1998 MT 340, ¶ 37, 292 Mont. 325, ¶ 37, 972 P.2d 816, ¶ 37, *overruled on other grounds by State v. Good,* 2002 MT 59, 309 Mont. 113, 43 P.3d 948. Likewise, whether Tichenor was unlawfully in Nall's apartment was a question of fact for the jury and it would have been improper for the judge to step into the jury's place and resolve these issues pretrial.

¶22 Tichenor relies on *State v. David* (1994), 266 Mont. 365, 880 P.2d 1308, to support his argument that the charges of burglary and stalking should be dismissed. However, *David* is distinguishable from the case *sub judice* because in *David*, the District Court denied the State's motion for leave to file an Information charging the defendant with stalking because there was not sufficient probable cause. *David*, 266 Mont. at 366-67, 880 P.2d at 1309.

7

Here, the District Court had already granted the State's motion for leave to file an Information against Tichenor, thus establishing that the State had probable cause to bring the charges. The State had no further burden of proof with regard to these charges until trial. *See State v. Nichols*, 1998 MT 271, ¶ 4, 291 Mont. 367, ¶ 4, 970 P.2d 79, ¶ 4 (holding that the defendant's challenge to the evidence through a pretrial motion to dismiss "was premature because such a challenge can only be made after the State has had an opportunity to present its evidence to the trier of fact").

¶23 Accordingly, we hold that the District Court properly denied Tichenor's pretrial motion to dismiss the burglary and stalking charges because the motion was premature.

**Issue 2.**

¶24 *Did the District Court properly deny Tichenor's motion to dismiss the felony stalking count?*

¶25 Tichenor argues that there should have been only one count of misdemeanor stalking and that his right to be free from double jeopardy was violated when he was charged and convicted twice for the same offense. He also contends that if he did commit two stalking offenses, they were both misdemeanor offenses. Finally, Tichenor contends that the facts that gave rise to the second stalking count happened before the facts that gave rise to the first stalking count, therefore, there could not have been a second or subsequent offense that would constitute a felony charge.

¶26 County attorneys in Montana are charged with a duty to conduct, on the State's behalf, all prosecutions for public offenses. Section 7-4-2716(1), MCA. In discharging that duty, a

county attorney has broad discretion to determine whether to prosecute an offender and what offense to charge. *State ex rel. Fletcher v. District Court* (1993), 260 Mont. 410, 414-15, 859 P.2d 992, 995.

¶27 We agree with the State that the prosecutor properly exercised her discretion in charging two counts of stalking as the evidence supported two distinct charges. Stalking is defined as follows:

> (1) A person commits the offense of stalking if the person purposely or knowingly causes another person substantial emotional distress or reasonable apprehension of bodily injury or death by repeatedly:
> (a) following the stalked person; or
> (b) harassing, threatening, or intimidating the stalked person, in person or by phone, by mail, or by other action, device, or method.

Section 45-5-220, MCA.

¶28 Shortly after Tichenor's arrest on November 4, 1999, on the charges of burglary and partner or family member assault, Judge Jewell ordered Tichenor not to have any contact with Nall. Yet, between November 11 and November 16, 1999, Tichenor's cell phone records showed that he called Nall a total of 69 times. Tichenor committed a second offense of stalking when, following his arrest on November 23, 1999, for violating the first no-contact order, he was again ordered by Judge Jewell not to have any contact with Nall, yet he repeatedly harassed her by phone and by mail from the county jail. The acts committed from the jail were aimed not only at Nall, but at her daughter as some of the mail was directed to Nall's daughter. Given the fact that Tichenor violated two separate orders issued by Judge Jewell, the fact that Tichenor's November 23, 1999 arrest was a break in his course of

9

conduct, and the fact that Tichenor now included a second individual in his harassment, Nall's daughter, we hold that the prosecutor acted within her discretion in charging two offenses, as opposed to one.

¶29 Tichenor also argues that under § 46-11-410(2)(e), MCA, he cannot be convicted of more than one offense if that offense is defined to prohibit a continuing course of conduct. He maintains that the term "repeatedly" in the stalking statute is the same as the phrase "continuing course of conduct" in § 46-11-410, MCA, thus he could only be charged with one count of stalking for his numerous phone calls to Nall.

¶30 However, Tichenor's argument raising § 46-11-410, MCA, is being raised for the first time on appeal. It is well settled that this Court will not review issues raised for the first time on appeal and we will not hold a district court in error where the court was never given an opportunity to correct itself. *State v. Baker*, 2000 MT 307, ¶¶ 29-30, 302 Mont. 408, ¶¶ 29-30, 15 P.3d 379, ¶¶ 29-30; *State v. Weeks* (1995), 270 Mont. 63, 85, 891 P.2d 477, 490. Moreover, objecting parties must make the basis and grounds for their objection clear to the court. *Baker*, ¶¶ 29-30; *Weeks*, 270 Mont. at 85, 891 P.2d at 490. And, the objection must be specific enough to inform the court or the prosecutor of the issue. *See State v. McKeon* (1997), 282 Mont. 397, 408-09, 938 P.2d 643, 649-50. Having failed to reference § 46-11-410, MCA, in the District Court, Tichenor is barred from relying upon that statute as a basis of error.

¶31 Tichenor next argues that if he did indeed commit two offenses, they were both misdemeanor offenses and the felony charge must be dismissed. On the contrary, by

10

identifying the second count of stalking as a felony, the State gave Tichenor notice that if he were convicted of both counts, the second count would be treated as a felony for sentencing purposes. See § 45-5-220(3), MCA. Whether a person has committed a prior offense of stalking is a sentencing factor, not an element of the offense of stalking. *See Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (holding that any fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt); *State v. Baker*, 2000 MT 235, 301 Mont. 323, 8 P.3d 817 (holding that age factor in sexual assault statute pertains only to sentencing and is not an element of the offense).

¶32    In opposing Tichenor's motion to dismiss, the State noted that if Tichenor were convicted of only one offense of stalking, he would receive a misdemeanor penalty, but that if he were convicted of both offenses, he would be sentenced for both a misdemeanor and a felony. Consequently, once the jury convicted Tichenor of both offenses, it was then proper for the District Court to sentence him to a felony on the second offense pursuant to the sentencing provisions of § 45-5-220(3), MCA:

> For the first offense, a person convicted of stalking shall be imprisoned in the county jail for a term not to exceed 1 year or fined an amount not to exceed $1,000, or both. For a second or subsequent offense . . . the offender shall be imprisoned in the state prison for a term not to exceed 5 years or fined an amount not to exceed $10,000, or both.

11

Hence, if the jury failed to convict Tichenor on one of the stalking counts, the District Court would have been precluded from imposing a felony sentence.

¶33 Tichenor also maintains that the second stalking charge should have been dismissed because there was no "prior conviction" upon which to base the felony charge. However, § 45-5-220, MCA, does not require that there be a prior "conviction" before the offender receives a felony sentence. Rather, the statute refers to a "second or subsequent *offense*."

¶34 Tichenor's final argument on this issue is that since the facts giving rise to Count VI (calling Nall from his cell phone) took place prior to those giving rise to Count V (calling Nall from jail), Count VI could not have been a second or subsequent offense requiring a felony sentence. This argument lacks merit. The jury convicted Tichenor of two counts of stalking and the judge sentenced the second count as a felony. The order in which the stalking counts were listed on the Information and on the verdict form is irrelevant, the fact remains that Tichenor was convicted of two counts of stalking.

¶35 Accordingly, we hold that the District Court did not err in denying Tichenor's motion to dismiss the felony stalking count.

### Issue 3.

¶36 *Did the District Court properly exercise its discretion in giving Jury Instructions 23 and 24 regarding stalking?*

¶37 This Court reviews jury instructions in criminal cases to determine whether the instructions as a whole, fully and fairly instruct the jury on the applicable law. *State v. Scarborough*, 2000 MT 301, ¶ 47, 302 Mont. 350, ¶ 47, 14 P.3d 1202, ¶ 47 (citing *State v.*

12

*Patton* (1996), 280 Mont. 278, 286, 930 P.2d 635, 639; *State v. Brandon* (1994), 264 Mont. 231, 237, 870 P.2d 734, 737).  To constitute reversible error, a district court's rulings on the jury instructions must prejudicially affect the defendant's substantive rights.  *Scarborough*, ¶ 47 (citing *State v. Beavers*, 1999 MT 260, ¶ 33, 296 Mont. 340, ¶ 33, 987 P.2d 371, ¶ 33; *State v. Goulet* (1997), 283 Mont. 38, 41, 938 P.2d 1330, 1332; *State v. Bradley* (1995), 269 Mont. 392, 395, 889 P.2d 1167, 1168).

¶38   The District Court gave the following jury instructions with regard to the two counts of stalking.  Jury Instruction 22 read as follows:

> A person commits the offense of stalking if the person purposely or knowingly causes another person substantial emotional distress or reasonable apprehension of bodily injury or death by repeatedly:
> (a)  following the stalked person; or,
> (b)  harassing, threatening, or intimidating the stalked person, in person
>
> or by phone, by mail, or by other action, device, or method.

Jury Instruction 23 read as follows:

> To convict the defendant of Count V - stalking, the State must prove the following elements:
> 1.  That the defendant purposely or knowingly
> 2.  Caused Bobbi Jo Nall substantial emotional distress or reasonable apprehension of bodily injury or death by repeatedly:
> a.  harassing or intimidating her, by calling her home approximately 54 times from the Lewis and Clark County Jail, and by having items mailed to her home *after having been ordered by Justice of the Peace Wallace Jewell to have no contact with her*.  [Emphasis added.]

Jury Instruction 24 read as follows:

> To convict the defendant of Count VI - stalking, the State must prove the following elements:
> 1.  That the defendant purposely or knowingly

2. Caused Bobbi Jo Nall substantial emotional distress or reasonable apprehension of bodily injury or death by repeatedly:

a. harassing or intimidating her, by calling her home approximately 46 times from his cell phone, *after being ordered by Justice of the Peace Jewell to have no contact with her*. [Emphasis added.]

¶39 Tichenor objects to the reference to the no-contact order in Jury Instructions 23 and 24 as being irrelevant to the stalking charges. He also contends that Jury Instructions 23 and 24 had a prejudicial effect on his substantive rights because they allowed the jury to convict him of felony stalking by confusing the issue of whether his violation of conditions on bail was sufficient to satisfy the element in the felony stalking statute regarding violation of an order of protection.

¶40 Tichenor's argument is unsupported by the record. The State never contended that an order of protection was in place and the jury was never instructed on the sentencing provisions of the stalking statute. Hence, the jury could not have been confused in this regard.

¶41 The additional language in the jury instructions regarding the no-contact order by Judge Jewell did not diminish the State's burden of proving every element of the stalking offenses. Consequently, we hold that the instructions, as a whole, fully and fairly instructed the jury on the applicable law and did not prejudicially affect Tichenor's substantive rights. *Scarborough*, ¶ 47.

¶42 Accordingly, we hold that the District Court properly exercised its discretion in giving Jury Instructions 23 and 24 regarding stalking.

14

¶43    That said, Justice Cotter has raised several contentions in her dissent to Issue 2 that deserve a response. First, she argues that Tichenor "was not on notice that the first series of calls would give rise to stalking charges." Contrary to Justice Cotter's contention, the stalking statute itself gives an individual notice that such conduct could give rise to charges. To say that Tichenor was not on notice that 69 telephone calls made to Nall over a one-week period after he had threatened to kill her could be considered stalking is as absurd as saying that Tichenor was not on notice that entering Nall's house through a window after she locked the door to keep him out could give rise to burglary charges.

¶44    Furthermore, to claim ignorance of the law when the record reflects that this was the third time that Tichenor had harassed women who had attempted to terminate their relationships with him is ridiculous. Although neither of those two previous occasions resulted in stalking charges being filed against Tichenor (the first incident occurred prior to the enactment of the stalking statute and, in the second incident, the victim refused to press charges), nevertheless, one resulted in Tichenor's probation being revoked and the other resulted in assault charges being filed against Tichenor.

¶45    If Tichenor wanted to argue that the statute failed to give him notice that his conduct would give rise to stalking charges as Justice Cotter suggests, then Tichenor should have attempted to attack the stalking statute on void for vagueness grounds. *See State v. Dixon*, 2000 MT 82, ¶ 20, 299 Mont. 165, ¶ 20, 998 P.2d 544, ¶ 20 ("a statute is void on its face if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden"). However, Tichenor did not raise any constitutional challenge to the stalking

15

statute, hence it is inappropriate to now argue that Tichenor was not on notice that his conduct would give rise to stalking charges.

¶46     Moreover, this Court adheres to the old maxim: "Ignorance of the law is no excuse." *State v. Lynn* (1990), 243 Mont. 430, 435-36, 795 P.2d 429, 433 (citing *State ex rel. Rowe v. District Court* (1911), 44 Mont. 318, 119 P. 1103).  In *Lynn*, the defendant was convicted of two game violations.  He argued on appeal that the State failed to prove that he was aware that hunting from a public highway was prohibited in Montana or that the season on bighorn sheep was closed.  We held in *Lynn* that the defendant's alleged ignorance of Montana's laws regarding hunting was no excuse and that the State had no burden to prove that the defendant had knowledge that road hunting is illegal or that the season for hunting bighorn sheep was already closed.

¶47     In addition, this Court stated in *Rowe*:

>        Ignorance of the law cannot be urged as an excuse for a violation of it. Nor is good faith, under such circumstances, any justification or excuse.  The rule rests on public necessity; the welfare of society and the safety of the state depend upon its enforcement.  If a person accused of a crime could shield himself behind the defense that he was ignorant of the law which he violated, immunity from punishment would in most cases result.  No system of criminal justice could be sustained with such an element in it to obstruct the course of its administration.  The plea would be universally made, and would lead to interminable questions incapable of solution.  Was the defendant in fact ignorant of the law?  Was his ignorance of the law excusable?  The denser the ignorance, the greater would be the exemption from liability.
>        . . . When the statute plainly forbids an act to be done, and it is done by some person, the law implies conclusively the guilty intent, although the offender was honestly mistaken as to the meaning of the law he violates.

16

When the language is plain and positive, and the offense is not made to depend

upon the positive, willful intent and purpose, nothing is left to interpretation.

It would be a very dangerous exercise of the power of courts to interpret

positive statutes so as, in effect, to interpolate into them exceptive provisions.

If the court could do so, there would be scarcely a limit beyond which it might

not go, and thus make, instead of interpret, the law.

*Rowe*, 44 Mont. at 324-25, 119 P. at 1106-07 (internal citations omitted).

¶48     Justice Cotter next claims that Tichenor is not raising his argument regarding § 46-11-410, MCA, for the first time on appeal, thus he has not waived that argument. Justice Cotter maintains that Tichenor did raise this argument in his closing brief on his motion to dismiss when he asked the District Court to "see this case for what it is lest the jeopardy of punishment far exceed the seriousness of the circumstances," and again when he used the phrase "double jeopardy" in his motion to set aside the verdict. In the first instance, Tichenor is not arguing that he has been charged twice for the same crime, but rather, he is arguing that the punishment in his case exceeds the crime. Merely because he used the term "jeopardy" is not sufficient to conclude that he raised an argument under § 46-11-410, MCA. Secondly, while Tichenor did use the phrase "double jeopardy" in his motion to set aside the verdict, he offered no citation to authority in support of his allegation. As we noted previously in this Opinion, objecting parties must make the basis and grounds for their objection clear to the court, *Baker*, ¶¶ 29-30, and the objection must be specific enough to inform the court or the prosecutor of the issue, *McKeon*, 282 Mont. at 408-09, 938 P.2d at 649-50. Having failed to

17

reference § 46-11-410, MCA, in the District Court, Tichenor is barred from relying upon that statute as a basis of error.

¶49    Justice Cotter also argues that the District Court erred by failing to merge the two counts of stalking into one misdemeanor count because stalking is a continuing offense that requires repeated conduct and unless a defendant's course of conduct is broken, any continuation of behavior constitutes one stalking offense.  In this case, Tichenor's conduct was broken not merely by his arrest as Justice Cotter contends, but also by time, by the circumstances under which the conduct occurred, and by the intensity of the conduct after his arrest.

¶50    Tichenor was ordered not to have contact with Nall, yet he attempted to call her 69 times between November 11 and November 16, 1999.  He was subsequently arrested after his bond was revoked for violating the "no contact" order and again ordered not to have contact with Nall.  Nevertheless, Tichenor began a new series of phone calls to Nall from jail beginning on November 24, 1999 and ending on November 28, 1999, when all calls from the jail to Nall were blocked by the authorities.  Nall testified at trial that she was particularly distressed by these calls because neither two warnings by a judge not to contact Nall nor an arrest for violating the "no contact" order could deter Tichenor from attempting to contact her.

¶51    Moreover, Tichenor's conduct seemed to intensify after his arrest.  Nall testified that in one of the calls from jail, Tichenor left a message on her answering machine warning her that if she testified against him, she should fear for her life and that of her daughter.  In

18

addition, while in jail, Tichenor began writing to Nall and requesting various mailings be delivered to her. While these mailings were not threatening in themselves, Nall testified that she was extremely disturbed by them because they were addressed to Tichenor at her address and at least one was addressed to "Kent and Bobbi Jo Tichenor"--implying a type of relationship that had never existed between them--and another was directed toward Nall's daughter. Unless a statute specifically so requires, there is nothing in Montana's criminal law requiring that ongoing criminal activity must be charged as one crime when a crime is committed over and over by different means. Moreover, it would frustrate the policy of the stalking statute to take the position that all instances of similar types of conduct have to be merged into one charge particularly in light of the escalating nature of the conduct.

¶52 Finally, Justice Cotter argues in her dissent that dividing Tichenor's conduct into two separate offenses was manifestly unfair in light of both the law and Nall's willing and intimate relations with Tichenor in the midst of that course of conduct. It is true that Nall engaged in intimate relations with Tichenor after the first series of calls. However, that did not give Tichenor license to continue to harass Nall.

¶53 Nall testified that she was not aware that Tichenor would be at her friends' house that evening and that Tichenor approached her and hugged her. She testified that she did not feel threatened by his presence that night initially because several other people were present and later because "he did not look like the monster that broke into my house that night and threatened to kill me." She further testified that she spent that evening and part of the following day with him because she believed that it would put an end to the problems

19

between them and would provide closure for both of them. To that end an investigator for the Helena Police Department specializing in offenses involving domestic violence testified that it is not unusual for a victim of this type of crime to have further contact with their abuser in an attempt to keep the abuser from becoming angry and to prevent further violence.

¶54 Nevertheless, had Nall not been distressed by the calls and the mail she received from Tichenor after the night they spent together, she would not have reported them to the police. Nall testified at Tichenor's trial that she continued to fear Tichenor and the jury found her testimony credible.

¶55 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/JOHN WARNER
Judge John Warner sitting for Justice
Jim Rice

Justice Patricia O. Cotter dissents.

¶56    I dissent from the Court's disposition of Issue 2.  I believe the District Court erred when it failed to either dismiss the second stalking count or merge the stalking counts into one misdemeanor charge.

¶57    Tichenor was first arrested on November 4, 1999, on three burglary counts and one partner family member assault charge.  He bonded out of jail on November 9, 1999, with the admonishment from the Justice of the Peace not to have contact with Nall.  Between November 11 and 16, Tichenor called Nall 69 times.  Nall apparently reported the calls on November 14, 1999, and ten days later, Tichenor was arrested for violating the "no contact" order.  In the mean time, however, it is undisputed that on the night of November 22, 1999, Nall and Tichenor saw each other at a mutual friend's house where they were seen kissing and hugging, and also visiting for over a half an hour in Nall's car.  Later that evening, Tichenor was invited to Nall's apartment, where he spent the night, as well as the majority of the next day.  Tichenor was then arrested the following day, November 24, 1999, when his bond was revoked for allegedly violating his conditions of release by contacting Nall.

¶58    It appears that the demarcation for the two "discrete series" of stalkings identified in the original Information was Tichenor's arrest on November 24, 1999.  However, Tichenor's arrest that day was not for stalking, but rather was the result of the revocation of his bond, based on allegations that he had violated the "no contact" order.  While Tichenor and Nall had engaged in prohibited contact, it seems clear that given Nall's behavior and encouragement, Tichenor had no reason at this point to think that any of the conduct was

22

either threatening or harassing to Nall. Tichenor was not charged with stalking until the Information was filed on December 17, 1999, which was well after the "second series" of calls had ceased. In other words, when the second series of calls began, Tichenor was not on notice that the first series of calls would give rise to stalking charges.

¶59 The State argues, and the Court agrees, that Tichenor is barred from raising § 46-11-410, MCA, since he raises it for the first time on appeal. However, a close analysis of Tichenor's motion to dismiss and his objection to the filing of the amended information suggests otherwise. During the hearing on his motion to dismiss and in his reply brief, Tichenor argued that if they occurred at all, the two charges of stalking, one misdemeanor and one felony, were really one event. In his closing brief on his motion to dismiss, Tichenor asked the District Court to "see this case for what it is lest the *jeopardy of punishment* far exceed the seriousness of the circumstances" (emphasis added). (Section 46-11-410, MCA, is codification of the double jeopardy protection against multiple punishments for the same offense. *See*, Commission Comments, § 46-11-410, MCA.)

¶60 In April of 2000, before the District Court ruled on Tichenor's motion to dismiss, the State moved to amend the Information, adding the mailings as a third count of stalking. Tichenor objected to the proposed amendment, arguing that "the repeated course of conduct, whether or not it amounts to stalking, should be one count rather than three." Finally, following the trial, in his motion for a new trial or to set aside the verdict, Tichenor argued that his right to be free from double jeopardy was violated when he was charged with more than one stalking offense.

¶61    The State continued to assert that the two series of calls and the mailings from jail were completely distinct and separate and involved totally different circumstances, arguing that "[n]othing in the criminal law require[d] that on-going criminal activity necessarily be charged as one crime, when in fact, a crime is committed over and over by different means." However, stalking is a continuing offense that requires repeated conduct. *See*, § 45-5-220, MCA. Therefore, unless a defendant's course of conduct is broken, any continuation of behavior allegedly constituting stalking, constitutes one stalking offense. *See, State v. Vigil* (Tenn. Crim. App. 2001), 65 S.W.3d 26, 35. In my opinion, the District Court erred by failing to merge the original counts of stalking into one misdemeanor count.

¶62    Dividing Tichenor's continuous conduct into two separate offenses, and the elevation of the second offense to a felony, was manifestly unfair in light of both the law and the victim's willing and intimate relations with Tichenor in the midst of that course of conduct which would later result in his conviction of felony stalking. For these reasons, I would vacate the felony stalking conviction and affirm the misdemeanor stalking conviction.

/S/ PATRICIA COTTER

Justices W. William Leaphart and Terry N. Trieweiler join in the foregoing dissent.

/S/ W. WILLIAM LEAPHART
/S/ TERRY N. TRIEWEILER

24